UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT
_____

No. 24-1829
_____
_____

UNITED STATES,
Appellee,

v.

LILIAN GIANG,
Defendant-Appellant.
_____

ON APPEAL FROM A JUDGMENT OF THE
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
_____

BRIEF OF DEFENDANT-APPELLANT
LILIAN GIANG
_____

Christine DeMaso
Assistant Federal Public Defender
Federal Public Defender Office
District of Massachusetts
51 Sleeper Street, 5th Floor
Boston, MA 02210
(617) 223-8061
Identification No.: 1168061

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ......................................................................... i

TABLE OF AUTHORITIES ................................................................. iv

JURISDICTIONAL STATEMENT ........................................................ 1

ISSUE PRESENTED FOR REVIEW ..................................................... 1

STATEMENT OF THE CASE ............................................................... 2

SUMMARY OF ARGUMENT .............................................................. 14

ARGUMENT ...................................................................................... 17

   I.    The government presented insufficient evidence that there was a
        mailing in furtherance of the charged mail-fraud scheme. ................ 17

      A.    Standard of review. ............................................................. 17

      B.    Elements of mail fraud. ....................................................... 18

      C.    The government presented insufficient evidence that a mailing
            was made and that Ms. Giang could reasonably foresee this
            mailing. .............................................................................. 19

      D.    Ms. Giang's conviction is a clear and gross injustice, and
            reversal of Count 5 is required. ........................................... 23

II.   The court improperly admitted evidence related to the requirement that withdrawals over $10,000 must be reported to the federal government. ...............................................................25

      A.   Standard of review. ...............................................................26

      B.   The evidence did not support the  inference that Ms. Giang tried to avoid triggering reporting requirements and was irrelevant. ...............................................................28

      C.   Even accepting, arguendo, that Ms. Giang tried to avoid triggering reporting requirements, this evidence did not have special relevance and was unfairly prejudicial. ..............................29

III.  The court wrongly failed to give implicit-bias instructions after empanelment and before deliberations. ..............................................31

      A.   Standard of review. ...............................................................33

      B.   The importance of educating jurors about implicit bias. ................34

      C.   The court erroneously failed to give the requested implicit-bias instructions after empanelment and before deliberations............36

IV.   The court's good-faith and employment-tax instructions improperly reduced the government's burden to prove every element of the offenses charged. ..........................................................40

      A.   Standard of review. ...............................................................43

      B.   The employment-tax instruction contained an incomplete statement of tax law that relieved the government of its burden to prove every element beyond a reasonable doubt. ..........................44

C.   The court's good-faith instruction erroneously reduced the government's burden of proof and tended to confuse and mislead the jury on a critical issue. ...................................................48

D.   Taken together, the instructional errors require reversal. .............51

CONCLUSION ......................................................................................52

CERTIFICATE OF COMPLIANCE WITH RULE 32(A) .................................53

CERTIFICATE OF SERVICE ...............................................................................54

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Bryan v. United States,*
    524 U.S. 184 (1998) ...................................................................41

*Cheek v. United States,*
    498 U.S. 192 (1991) ...............................................41, 43, 48, 50, 51

*Lee v. Howard Hughes Medical Institute,*
    607 F.Supp.3d 52 (D.Mass. 2022) .............................................35

*Pepper v. United States,*
    562 U.S. 476 (2011) ...................................................................25

*Schmuck v. United States,*
    489 U.S. 705 (1989) ...................................................................18

*United States v. Baird,*
    712 F.3d 623 (1st Cir. 2013) .....................................................33

*United States v. Blanchard,*
    618 F.3d 562 (6th Cir. 2010) .....................................................41

*United States v. Brown,*
    26 F.4th 48 (1st Cir. 2022) ........................................................25

*United States v. Cacho–Bonilla,*
    404 F.3d 84 (1st Cir. 2005) .......................................................19

*United States v. Cantwell,*
    64 F.4th 396 (1st Cir. 2023) ......................................................43

*United States v. Casanova,*
    886 F.3d 55 (1st Cir. 2018) .................................................33, 39

iv

*United States v. Contenti*,
    735 F.2d 628 (1st Cir. 1984) ...................................................19

*United States v. Dawlett*,
    787 F.2d 771 (1st Cir. 1986) ...............................................23, 24

*United States v. DiRico*,
    78 F.3d 732 (1st Cir. 1996) ...............................................47, 48

*United States v. Duarte*,
    246 F.3d 56 (1st Cir. 2001) ...................................................18

*United States v. Falcón-Nieves*,
    79 F.4th 116 (1st Cir. 2023) ...............................................17, 23

*United States v. Figueroa-Lugo*,
    793 F.3d 179 (1st Cir. 2015) ...................................................33

*United States v. Frankhauser*,
    80 F.3d 641 (1st Cir. 1996) ...................................................27

*United States v. Gamache*,
    156 F.3d 1 (1st Cir. 1998) ...................................................33

*United States v. Gelin*,
    712 F.3d 612 (1st Cir. 2013) ...............................................33, 34

*United States v. Hebshie*,
    549 F.3d 30 (1st Cir. 2008) ...........................................18, 19, 23

*United States v. Hicks*,
    575 F.3d 130 (1st Cir. 2009) ...................................................27

*United States v. Jadlowe*,
    628 F.3d 1 (1st Cir. 2010) ...................................................43

*United States v. Karani,*
    984 F.3d 163 (1st Cir. 2021) ...............................................41, 50

*United States v. Kilcullen,*
    546 F.2d 435 (1st Cir. 1976) ..........................................................25

*United States v. Latorre-Cacho,*
    874 F.3d 299 (1st Cir. 2017) ..........................................................44

*United States v. Maze,*
    414 U.S. 395 (1974) ......................................................................19

*United States v. McLellan,*
    959 F.3d 442 (1st Cir. 2020) ..........................................................33

*United States v. Morillo,*
    158 F.3d 18 (1st Cir. 1998) ............................................................24

*United States v. Morrow,*
    39 F.3d 1228 (1st Cir. 1994) ..................................................22, 23

*United States v. O'Donovan,*
    126 F.4th 17 (1st Cir. 2025) ..........................................................22

*United States v. Parker,*
    872 F.3d 1 (1st Cir. 2017) ......................................................33, 39

*United States v. Pratt,*
    568 F.3d 11 (1st Cir. 2009) ....................................................17, 18

*United States v. Slater,*
    562 F.2d 58 (1st Cir. 1976) ............................................................25

*United States v. Spinner,*
    152 F.3d 950 (D.C. Cir. 1998) ................................................24, 25

*United States v. Tavares,*
844 F.3d 46 (1st Cir. 2016) ...................................................................18, 19

*United States v. Todosijevic,*
161 F.3d 479 (7th Cir. 1998).........................................................................24

*United States v. Varoudakis,*
233 F.3d 113 (1st Cir. 2000) ...................................................................27, 30

**Federal Statutes**

18 U.S.C. §1341.............................................................................................3, 18

18 U.S.C. §3231.................................................................................................1

26 U.S.C. §7202.......................................................................................3, 40, 49

28 U.S.C. §1291.................................................................................................1

**Rules**

Fed. R. Crim. P. 29...........................................................................................17

Fed. R. Evid. 104..............................................................................................26

Fed. R. Evid. 403.....................................................................................26, 27, 31

Fed. R. Evid. 404.................................................................................26, 27, 29, 31

## Articles

Judge Mark W. Bennett, *Unraveling the Gordian Knot of Implicit Bias in Jury Selection*, 4. Harv. L. & Pol. Rev. 149 (2010) ...............................34, 36, 38

Gary Blasi, *Advocacy Against the Stereotype*, 49 UCLA L. Rev. 1241 (2002)......................................................................................................34, 35

Anthony G. Greenwald & Linda Hamilton Krieger, *Implicit Bias: Scientific Foundations*, 94 Cal. L. Rev. 945 (2006)......................................................34

Jerry Kang & Kristen Lane, *Seeing Through Colorblindness: Implicit Bias and the Law*, 58 UCLA L. Rev. 465 (2010).................................................34, 35

Angela Onwuachi-Willig, *Roberts's Revision: A Narratological Reading of the Affirmative Action Cases*, 137 Harv.L.Rev. 192 (2023) ............................35

The Honorable Cherron Payne, *All Cases Matter: Mitigating Bias in the Administrative Law Judiciary*, 43 J.Nat'l Ass'n Admin.L.Jud. 1 (2023) ........................................................................................................35

## Other

Pattern Criminal Jury Instructions for the District Courts of the First Circuit ..............................................................................................31, 49

Supreme Judicial Court Model Jury Instructions on Implicit Bias, *available at* https://www.mass.gov/info-details/supreme-judicial-court-model-jury-instructions-on-implicit-bias ....................................................31, 37

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 18 U.S.C. §3231, which grants the district courts exclusive jurisdiction over all federal offenses.

This Court has jurisdiction pursuant to 28 U.S.C. §1291, which confers jurisdiction to review final district court decisions.

The court entered judgment on September 9, 2024. Add. 19. Ms. Giang filed a timely notice of appeal on September 11, 2024. JA.II 903.[1]

## ISSUE PRESENTED FOR REVIEW

1. Whether the government presented insufficient evidence of a mailing in furtherance of the charged mail fraud?

2. Whether the court erred by admitting evidence that cash withdrawals over $10,000 must be reported to the government where Ms. Giang was not charged with structuring and the evidence did not support the inference that she tried to avoid these reporting requirements?

3. Whether the court erroneously denied Ms. Giang's request for implicit-bias instructions after empanelment and before deliberations?

---

[1] Citations are as follows: Add. refers to the addendum; JA.X to Volume X of the joint appendix; SA to the sealed appendix; and DE to a district court docket entry.

4. Whether the court's good-faith and employment-tax jury instructions were improper and reduced the government's burden to prove each element beyond a reasonable doubt?

## STATEMENT OF THE CASE

Lilian Giang was born in Vietnam during the Vietnam War. JA.II 496-505; SA 11. Her father died when she was a child, and she left school after 7th grade to help her mother raise pigs and sell their meat. *Id.* In 1988, Ms. Giang and her mother came to America after spending time in a refugee camp in the Philippines. *Id.* In America, Ms. Giang married and had three children. *Id.* She and her husband supported their family by working as temps, in a factory, and at a nursing home. *Id.* In 1999, they bought a country store in New Hampshire. *Id.* The family worked in and lived above the store. *Id.* When their marriage failed, Ms. Giang and her husband sold the store. *Id.* Ms. Giang's ex-husband returned to Vietnam, and Ms. Giang was left to support their children. *Id.* Ms. Giang worked as a temp before starting Able Temp Agency (Able) in 2015. *Id.*

Able provided temporary labor to a variety of businesses. JA.II 505-08. These companies agreed with Able about, inter alia, the rate at which temporary employees would be paid. *See, e.g.*, JA.I 207-10; JA.II 509-11, 652-

53. When Able provided laborers, the companies paid Able the agreed-upon wages and Able paid the workers. JA.I 205-06; JA.II 509-10. Most of the laborers Able provided were Vietnamese immigrants. JA.II 508. Able transported these workers to and from jobs. JA.II 509.

The government alleged that Ms. Giang willfully failed to collect or pay over taxes by paying workers partly in cash without withholding taxes or declaring these payments as wages to the IRS, resulting in the underpayment of taxes. JA.I 12-15. It alleged that by understating her payroll in this way, Ms. Giang paid lower workers' compensation insurance premiums and committed mail fraud against her insurance company. *Id*. The government charged Ms. Giang with 4 counts of failure to collect or pay over taxes in violation of 26 U.S.C. §7202 and 1 count of mail fraud in violation of 18 U.S.C. §1341. JA.I 16-17. She was convicted after trial and sentenced to 18 months of incarceration. Add. 19-20.

The government called 9 witnesses: representatives from two companies that got labor from Able, two individuals Able paid, a bank teller, Ms. Giang's daughter, an insurance company investigator, an IRS special agent, and an auditor from the US Attorney's Office. Ms. Giang called her accountant and testified in her own defense.

In its opening, the government said that the evidence would show that between 2015 and 2019, Ms. Giang paid her employees $3.2 million in cash to hide this portion of her payroll from the IRS and her workers' compensation insurance company. JA.I 191. It stated that employers are required to pay taxes representing a percentage of the wages that they pay employees. JA.I 192. It said that employers report wages paid to employees (whether by cash or check) on Form 941 and their tax liability is calculated based on this information. JA.I 192-93. It maintained that Ms. Giang reported wages she paid by check, but not in cash, thus underrepresenting her payroll and tax liability. *Id.* The government stated that insurance premiums are based on payroll, with larger payrolls requiring higher insurance payments. JA.I 194-95. It asserted that Ms. Giang took "purposeful steps" to "keep her fraud going…." JA.I 197-98.

Defense counsel's opening described Ms. Giang's life as an immigrant with little education and limited English, who worked to create a business to support her family. JA.I 199-200. Counsel emphasized that the government had to prove that Ms. Giang knew that she was breaking the law and did so willfully. JA.I 199-202.

Gary Melville, the owner of Melville Candy Company, used temporary workers during busy seasons. JA.I 203-04. Between 2015 and 2019, he got temporary workers from Able. JA.I 206. Ms. Giang helped supervise these workers, assisted with communication and transportation, and had a key to the factory. JA.I 216-18, 221-23. Able sent him an invoice, he paid Able, and Able was responsible for paying the workers and withholding any applicable taxes. JA.I 205-08, 214; JA.II 652-53.

Ralph Dumican was an operations manager with Universal Wilde, a commercial print and mailing company that sometimes got temporary laborers from Able. JA.I 226-30. Ms. Giang brought workers to Universal Wilde and helped them communicate. JA.I 230-31, 241-42. He did not know how taxes were handled for temporary laborers. JA.I 242.

Ly Nguyen, a Vietnamese-speaking teller at Rockland Trust, routinely interacted with Ms. Giang when she banked at Rockland Trust.[2] JA.I 249-53, 258-59. Over objection, Ly Nguyen explained that when a customer withdrew more than $10,000, she had to report it to the back office which would report it to the branch. *Id.* She said that this currency

---

[2] There were three unrelated witnesses with the last name Nguyen. JA.I 294. For clarity, they will be referred to by their first and last names.

transaction report (CTR) would be filed with the government. *Id.* She said that at the bank's direction, she discussed this reporting requirement with Ms. Giang. JA.I 253, 258-61. In 2018, Rockland Trust investigators directed Ly Nguyen to ask Ms. Giang about her cash withdrawals. JA.I 253-57, 263-65. Ms. Giang responded that she used the cash to pay her workers. *Id.*

Dung Nguyen worked at Melville Candy through Able between 2015 and 2019. JA.I 266-69. She did not know how to drive, use public transportation, or call a taxi, and relied on Able to take her to and from the factory. JA.I 269-70, 277-79. Dung Nguyen testified that she was paid for 20 or 30 hours of work per week by check, and the rest of her hours were paid in cash. JA.I 270-71, 286-87. She did not mind being paid in cash. JA.I 283. Bank records contradicted her testimony about when and why she got checks from Ms. Giang. JA.I 284-91.

Nam Nguyen worked at an advertising company through Able between 2015 and 2017. JA.I 294-95. His wife also worked through Able. JA.I 303. When he first got work through Able, he was paid in cash. JA.I 296-98, 306-07. He asked to be paid by check to help support his case for naturalization. *Id.* Ms. Giang then paid him 20 hours a week by check at a rate of $11 per hour and additional hours in cash at a rate of $9 an hour. *Id.*

Nam Nguyen also worked as a driver for Able and was paid $2 cash per passenger per day. JA.I 300-01. Bank records contradicted his testimony that he never received a check for more than 20 hours of work. JA.I 309-12.

Mi Giang Kul, Ms. Giang's daughter, testified about her role processing Able's payroll. JA.I 316. Ms. Kul majored in accounting in college and had an MBA. JA.I 315. Ms. Kul did not receive a salary, but Ms. Giang paid her periodically. JA.I 317, 336-38. Ms. Giang sent workers' tax information to Ms. Kul who entered it into the Intuit payroll system. JA.I 321-22. Ms. Giang sent her daughter the hours that people worked via phone or text message, and Ms. Kul entered them into Intuit. JA.I 317-21. Based on the hours entered, Intuit generated weekly checks, yearly W-2s, and quarterly payroll tax reports (Form 941). JA.I 325-30, 339-40. Ms. Kul submitted Form 941s to the IRS electronically through Intuit. *Id*. Ms. Kul did not know that her mother paid workers in cash or by checks not generated by Intuit. JA.I 329-30.

Ms. Kul described her mother's background and life. JA.I 330-33. She explained that her mother had learned some English but needed help with communication and technology. JA.I 333-35. Ms. Kul sometimes helped her mother with matters unrelated to payroll. JA.I 341-48.

Shawn Curreri, an investigator with Travelers Indemnity Company, explained that most employers are required to have workers' compensation insurance, which covers benefits and medical bills for people who are injured on the job. JA.I 350-52. He said that employers with larger payrolls pay more for this insurance. JA.I 353-55. When an employer opens a policy, the insurance company estimates the premium. JA.I 355-56. Every year Travelers performs a premium audit by looking at the employer's payroll to determine whether the estimate was accurate. *Id.*

Travelers provided workers' compensation insurance for Able, and investigated Able's policy in 2020 when the IRS subpoenaed documents from Travelers. JA.I 356-57. Mr. Curreri reviewed documents, including emails and online communications about Able's yearly premium audits. JA.I 357-58. He explained that after auditing the 2017-2018 payroll, Travelers refunded Able part of the premium it had paid. JA.I 371-72. He noticed that Ms. Giang reported paying $673,609 to subcontractors in 2018 despite having told Travelers that she did not hire subcontractors. JA.II 386-91. Ms. Giang told Mr. Curreri that this money went to "people I need day of during the busy season when my employees are not enough," and

that her accountant could answer follow-up questions. *Id.* He determined

that Ms. Giang owed $31,000 in insurance premiums. JA.II 391-96, 716-19.

Nicholas Comtois, an IRS revenue agent, explained some tax

information. JA.II 411-20. He described three types of employment taxes—

income, Social Security, and Medicare tax. JA.II 413. Social Security tax "is

computed at 12.4% of reported wages and 6.2% is withheld from the

employee's pay by the employer, and then the other 6.2% is the

employer is responsible for paying that portion." JA.II 414-16. For Medicare

taxes, employers withhold 1.45% of an employee's wages and pay an

additional 1.45% of those wages. JA.II 416-17. Employers are responsible

for withholding income tax from their employees' paychecks. JA.II 417-20.

He explained that employers file a Form 941 every quarter to report wages

paid. JA.II 420-22.

Agent Comtois explained that Form 1120 shows a business's income,

expenses, and tax liability. JA.II 426-27. He stated that Able's 2017 tax

return reported no wages, $250,543 in labor costs, and $1,185,913 in

subcontracted services. JA.II 427-31. He explained that payments to

subcontractors should be reported on Form 1099, and that employers do

not withhold taxes from or pay taxes on money paid to subcontractors.

JA.II 429-30, 435-36. He recognized that there are multiple factors involved in determining whether someone is an employee or a subcontractor. *Id.*

Lauren George, an auditor with the US Attorney's Office, presented an overview of Able's financial records from 2015 to 2019. JA.II 439-41, 831-54. In this period, customers paid Able $5,109,442 for labor. JA.II 441-43, 831. According to W-2 forms, Able paid $501,168 in wages to 22 individuals. JA.II 443-46, 832. Ms. George noted that there were people listed on the invoices sent to companies who did not get W-2 forms from Able. *Id.* Based on the available invoices, Able billed customers for 333,741.21 hours of work. JA.II 448-50, 833. Using this estimate and the minimum wage, she expected that Able's 2015-2019 payroll would have been $3,721,722. *Id.* Ms. George found 774 bank withdrawals totaling $3,713,185. JA.II 451-56, 834-51. She stated that Ms. Giang frequently made more than one withdrawal per week and noted that none of the withdrawals in 2017 exceeded $10,000. *Id.* She recognized that Ms. Giang made multiple withdrawals of over $10,000 in 2018. JA.II 472-73. Ms. George summarized her analysis into a chart that showed that Ms. Giang had $3.2 million in unreported payroll, meaning she owed $812,800 in payroll taxes. JA.II 469-70, 854.

Ms. Giang called one witness and testified in her own defense. Wayne Hussey, an accountant, testified that he and his father had prepared Ms. Giang's taxes since the late-1990s, when she and her husband bought a country store in New Hampshire. JA.II 476-79, 490. When Ms. Giang started Able, they prepared her personal and corporate taxes. JA.II 479-81. Ms. Giang brought them bank statements, and they talked everything through before filing her taxes. JA.II 480-82. She told Mr. Hussey the cash withdrawals were to pay day laborers. JA.II 481-83. He understood that these were "non-consistent workers," categorized the withdrawals as payments to subcontractors, and reported them as a business cost. JA.II 481-83, 492-93. She did not tell him that she paid some workers part in cash and part by check. JA.II 492-93. Money she withdrew for herself was reported as profits on her personal tax returns. *Id.* Typically, Able did not owe taxes, but Ms. Giang did. JA.II 481-88 (explaining Able "was designed not to ever make a profit, just to pass it on to her at the end of the day"). He did not prepare Form 941s or work on Able's payroll. JA.II 480-81, 490.

Ms. Giang testified that she was born in Vietnam and moved to America when she was 20. JA.II 496-97. She left school after the 7th grade and did not learn English until she was in a refugee camp in the

Philippines before moving to America. JA.II 496-99. She worked at a work center and did laundry at a nursing home before she and her husband bought a convenience store in New Hampshire. JA.II 500-02. Her family lived above and worked in the store; they had no employees. *Id.* When she and her husband began to have marital problems, they sold the store and divorced. JA.II 502-03. Her husband moved back to Vietnam and Ms. Giang was left to care for their three children. *Id*. She worked as a temp before starting Able. JA.II 502-05.

Ms. Giang explained that most people who got work through Able were Vietnamese, and she provided transportation because many did not have a license or car. JA.II 508-09. She said she paid some people part by check and part in cash because that was how they wanted to be paid. JA.II 511-12, 539-40. She paid a lower rate when she paid workers in cash because she understood that the difference would be used to pay taxes at the end of the year. JA.II 512-13. She said she explained this plan to her accountant and thought the taxes she paid at the end of the year came from this withheld money. JA.II 512-14 ("I did not think I did anything illegally because the amount I had withdrawn, by the end of the year people would know how much, and I would pay taxes. So I don't think I was trying to

avoid taxes or do anything wrong."). She said Ms. Kul helped her write emails but did not know she paid people in cash. JA.II 514-16, 525-27, 533. She did not have Mr. Hussey prepare Form 941s because she did not need to drive to New Hampshire to do that. JA.II 515. She told him about paying workers in cash, and he classified them as subcontractors. JA.II 515-17.

She explained that she took out the amount of cash she needed, as she needed it, and did not know about the $10,000 withdrawal-reporting requirement. JA.II 517-18, 534-38. She had no idea she was doing anything wrong until IRS agents said she was. JA.II 518. She thought the insurance company had the information it needed to calculate her premiums. JA.II 519-20 ("I did not tell the insurance company about paying people in cash because I thought the cash that I withdrew from the banks would show up at the end of the year in bank statements, and I would pay taxes. Either Able would pay taxes, or I myself would pay taxes on that.").

In closing, the government argued that Ms. Giang was making excuses and could not have forgotten to pay taxes on wages she paid in cash. JA.II 550-51. It argued that she deceived people so that she would pay less taxes and lower insurance premiums. JA.II 551, 564.

The defense's closing argued that Ms. Giang worked to support her family by running a business that provided reliable workers. JA.II 567-72. It explained that she paid taxes every year, relied on Mr. Hussey to prepare them, and believed that these payments accounted for the money withheld from cash payments to workers. JA.II 571-74. It noted that Ms. Giang never tried to hide the fact that she paid some workers in cash. JA.II 577-79. It argued that Ms. Giang had little education, limited English, and got in over her head, but never intended to defraud or to withhold taxes. JA.II 580-83.

The jury convicted Ms. Giang of all counts. JA.II 611-12. The court sentenced Ms. Giang to 18 months of incarceration. Add. 19-20. The judgment issued on September 9, 2024, and Ms. Giang filed a timely notice of appeal on September 11, 2024. Add. 19; JA.I 9, 903.

## SUMMARY OF ARGUMENT

A mail-fraud conviction requires proof that the defendant caused, or could reasonably foresee, the use of the mails in furtherance of the alleged scheme to defraud. The government alleged a single mailing—a premium adjustment notice Travelers sent Ms. Giang. JA.I 17. A witness, with no personal knowledge, testified that this notice was mailed from Georgia or Connecticut. JA.I 356, 371; JA.II 687. However, other evidence suggested

that this document was sent electronically. JA.I 362-66; JA.II 691-92. Other communications between Travelers and Ms. Giang were electronic. JA.I 357-63; JA.II 385-91, 406-08. The government did not present sufficient evidence that this document was mailed or that if it was, the mailing was reasonably foreseeable to Ms. Giang. Her mail-fraud conviction was a clear and gross injustice and must be vacated.

The government offered evidence that banks must report withdrawals over $10,000 to the federal government because it wanted to argue that Ms. Giang intentionally withdrew amounts below this threshold, showing her intent to commit the charged crimes. JA.I 66-118. Ms. Giang objected to the introduction of this evidence. *Id.* The evidence showed that although Ms. Giang did not withdraw more than $10,000 in 2017, in 2018, *after* she reportedly was informed of the reporting requirements, she repeatedly withdrew more than $10,000. JA.II 451-56, 472-73, 834-51. The evidence did not support an inference that Ms. Giang tried to avoid the reporting requirements, making evidence of them irrelevant, unfairly prejudicial, and confusing to the jury. The erroneous admission of this evidence requires reversal of all counts.

Ms. Giang asked the court to instruct jurors about implicit bias both after empanelment and before deliberation. JA.I 45-50. The court wrongly refused to give these instructions. JA.I 140-41, 373, 382-83; JA.II 608-09. The proposed instructions were developed by the Supreme Judicial Court of Massachusetts, which recommends them in all trials. JA.I 45-50. The court did not provide an adequate substitute for the requested instructions. The requested instructions, which promote fairness in all cases, were particularly important here where Ms. Giang's identity as a Vietnamese immigrant who spoke limited English was a central part of her trial and defense. The court erred by not giving the requested instructions, and reversal is required on all counts.

Over objection, the court informed jurors that employers have a duty to collect employment taxes on wages paid to employees and to report those wages on Form 941. JA.II 601. This instruction was incomplete and improperly removed elements of the offense from the jury's consideration. Also over objection, the court instructed that a person does not act in good faith "if she also acted with the purpose of deceiving others." JA.II 604-05. This instruction understated the mens rea standard required in tax cases. Part of Ms. Giang's defense was that she had little education, spoke limited

English, and did not understand the intricacies of the tax code. JA.II 580-83. She reported all the payments she made to workers—some as wages and some as payments to subcontractors. There were factual issues as to whether she had a duty to report all payments to workers in a certain way, understood that duty, and willfully disregarded it. It was crucial that the jury understood the mens rea standard applicable in tax cases. The court's instructions improperly removed these elements from the jury's consideration and reduced the government's burden. Reversal is necessary.

## ARGUMENT

### I. The government presented insufficient evidence that there was a mailing in furtherance of the charged mail-fraud scheme.

#### A. Standard of review.

Counsel moved for a judgment of acquittal when the government rested. JA.II 474-75. The court said the motion was preserved but decided to "let the jury have its first opportunity to rule before I make a final decision on the Rule 29." *Id.* Counsel did not renew this motion at the close of evidence or after the verdict. This Court reviews this claim for "clear and gross injustice." *United States v. Falcón-Nieves*, 79 F.4th 116, 124 (1st Cir. 2023). To prevail, Ms. Giang "must show that the four prongs required to

demonstrate plain error are met" and that her conviction "would result in 'clear and gross injustice.'" *Id.* (quoting *United States v. Pratt*, 568 F.3d 11, 15 (1st Cir. 2009)). "To establish plain error, a party must show '(1) that an error occurred (2) which was clear or obvious and which not only (3) affected the defendant's substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings.'" *Id.* (quoting *United States v. Duarte*, 246 F.3d 56, 60 (1st Cir. 2001).

## B. Elements of mail fraud.

"The federal mail fraud statute does not purport to reach all frauds, but only those limited instances in which the use of the mails is a part of the execution of the fraud, leaving all other cases to be dealt with by appropriate state law." *Schmuck v. United States*, 489 U.S. 705, 710 (1989) (internal quotation omitted). "To prove a violation of the federal mail fraud statute under 18 U.S.C. § 1341, the Government must prove: '(1) a scheme to defraud based on false pretenses; (2) the defendant's knowing and willing participation in the scheme with the intent to defraud; and (3) the use of interstate mail communications in furtherance of that scheme.'" *United States v. Tavares*, 844 F.3d 46, 58 (1st Cir. 2016) (quoting *United States v. Hebshie*, 549 F.3d 30, 35-36 (1st Cir. 2008)).

18

"Importantly, the last element, which we will refer to as the 'mailing element,' requires that the defendant both (1) *cause* the use of the mails, which includes reasonably foreseeable mailings, *and* (2) use the mails *for the purpose,* or *in furtherance,* of executing the scheme to defraud." *Hebshie*, 549 F.3d at 35-36. "'[T]he defendant need not personally mail anything so long as it is reasonably foreseeable that the mails will be used in the ordinary course of business to further the scheme.'" *Tavares*, 844 F.3d at 59 (quoting *United States v. Cacho–Bonilla*, 404 F.3d 84, 90 (1st Cir. 2005)). "[A]n accused causes a letter to be delivered by mail where he does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where he could reasonably foresee that use of the mails would result." *United States v. Contenti*, 735 F.2d 628, 631 (1st Cir. 1984); *see also United States v. Maze*, 414 U.S. 395, 399 (1974).

### C. The government presented insufficient evidence that a mailing was made and that Ms. Giang could reasonably foresee this mailing.

The government charged Ms. Giang with mail fraud based on a single alleged mailing—a premium adjustment notice dated December 6, 2018. JA.I 17. It argued that "[t]he mailing addresses are on the left and the Travelers witness told you that this mail was sent from a mailing center in

Georgia." JA.II 565. It did not explain how this mailing was foreseeable to Ms. Giang. *Id.* The government did not provide sufficient evidence that this document was mailed or that Ms. Giang could have reasonably foreseen that such a document would be mailed.

Ms. Giang got workers' compensation insurance with Travelers through an insurance agent in Hanover, Massachusetts. JA.II 404-06, 519-20. There was no evidence that mailings were exchanged during the process of getting insurance. *Id.* Travelers audited the policy every year to ensure that Able paid the correct premiums.[3] JA.II 355-56. Before the audit, Travelers sent Ms. Giang an "online invitation letter" explaining how to "complete [the] premium audit online."[4] JA.I 362-66; JA.II 406-08, 691-92. The letter explained that she could provide the necessary information, track her audit, view prior audits, "and obtain [her] Premium Adjustment

---

[3] This annual review was not unique to Able; Travelers audited all workers' compensation policies every year. JA.II 406. The audit entailed reviewing a company's payroll and determining whether the premiums the company paid had been too high or low. JA.I 355-56. Travelers reimbursed or billed the company based on the audit results. *Id.*

[4] There was no testimony about how Travelers sent this document. JA.I 362-65. It contains mailing addresses for Able and Travelers, but includes Able's user ID and is titled "Online Invitation Letter," suggesting that it was sent electronically. JA.II 691.

Notice" through Travelers' online tool. JA.II 691-92. Ms. Giang used the online tool to complete the audit. JA.II 406-08.

After the audit, Travelers issued a premium adjustment notice. JA.I 355-56. The government introduced a premium adjustment notice, dated December 6, 2018, for the policy period November 6, 2017 to November 6, 2018. JA.I 369-72; JA.II 687-90. It introduced a revised premium adjustment notice, dated August 5, 2020, for the same period. JA.II 391-96; 716-19. These documents list addresses for Travelers, Able, and Ms. Giang's insurance agent. JA.II 687-90, 716-19.

The only evidence of how the 2018 premium adjustment notice was sent came from Mr. Curreri, a senior investigator with Travelers. When asked "How does Travelers send out Premium Adjustment Notices to its customers?" he replied that they are "sent by regular mail" from Travelers' "printing office which is in Norcross, Georgia." JA.I 356. However, when he looked at the notice sent to Ms. Giang in 2018, he said it was "mailed from Travelers RMD," which is in Connecticut. JA.I 371; JA.II 687. These statements contradicted the online invitation letter which said the premium adjustment notice would be available electronically. JA.II 691-92.

As a senior investigator, Mr. Curreri "handle[d] matters involving potential premium fraud or avoidance on assigned risk workers' compensation insurance policies." JA.I 351. He did not explain how he knew about the mailing process for premium adjustment notices. He was not involved with Able's policy until 2020 and did not testify to personal knowledge of what Travelers sent Ms. Giang in 2018. JA.I 357; JA.II 396. *Cf. United States v. O'Donovan*, 126 F.4th 17, 36-37 (1st Cir. 2025) (holding agent had no basis to offer expert, lay opinion, or fact testimony as to whether iMessages are sent via internet). Mr. Curreri reviewed Able's Travelers file. JA.I 357-58. With the possible exception of the premium adjustment notice, the communications he described between Travelers and Ms. Giang were electronic. JA.I 357-72; JA.II 385-91, 396-403, 406-08. He communicated with Ms. Giang by email. JA.II 385-91, 396-403, 406-08, 714-15.

Given these electronic communications, Ms. Giang could not reasonably foresee that Travelers would *mail* her anything. Mailings from insurance companies can satisfy the mailing element if they are "'incidental' to an essential element in the scheme, namely, the criss-cross of mailings that would reasonably be expected when false claims are submitted to insurance companies, are processed, and are ultimately paid,

thereby making the fraud successful." *United States v. Morrow*, 39 F.3d 1228, 1237 (1st Cir. 1994); *see also Hebshie*, 549 F.3d at 36. This case is different: Ms. Giang and Travelers did not exchange mailings; they communicated electronically. JA.I 357-72; JA.II 385-91, 396-408. When she received a document inviting her to complete the audit process online, she accepted. JA.II 406-07, 691-92. This document said she could get her premium adjustment notice online. JA.II 691-92. In these circumstances, Ms. Giang could not reasonably foresee that Travelers would mail the premium adjustment notice.

### D. Ms. Giang's conviction is a clear and gross injustice, and reversal of Count 5 is required.

The lack of evidence that the premium adjustment notice was mailed and that any such mailing was reasonably foreseeable requires reversal under the clear-and-gross-injustice standard. Even under this exacting standard, it remains "'the imperative duty of a court to see that all the elements of [a] crime are proved, or at least that testimony is offered which justifies a jury finding those elements.'" *Falcón-Nieves*, 79 F.4th at 124 (quoting *United States v. Dawlett*, 787 F.2d 771, 775-76 (1st Cir. 1986)). This Court reversed a conviction as a clear and gross injustice where the

government presented no evidence of the jurisdiction element. *Id*. at 124-26 ("'In this instance the insufficiency of the evidence mandates reversal since plain error has been committed in an area so vital to the defendant. Surely our concept of justice is violated when a man is convicted of a crime he did not commit.'" (quoting *Dawlett*, 787 F.2d at 775-76)). It noted the following:

> If the evidence viewed in the light most favorable to the verdict gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence of the crime charged, [we] must reverse the conviction. This is so because ... where an equal or nearly equal theory of guilt and a theory of innocence is supported by the evidence viewed in the light most favorable to the prosecution, a reasonable jury *must necessarily entertain* a reasonable doubt.

*Id.* at 126 (quoting *United States v. Morillo*, 158 F.3d 18, 22 (1st Cir. 1998) (citations and internal quotations omitted)).

> "[R]equirements for plain error are met with respect to sufficiency of the evidence claims 'if the record is devoid of evidence pointing to guilt, or if the evidence on a key element was so tenuous that a conviction would be shocking.'"

*Id*. (quoting *United States v. Todosijevic*, 161 F.3d 479, 483 (7th Cir. 1998) (citations omitted)).

> "It would be a manifest miscarriage of justice to let a conviction stand [where] the government failed to present any evidence on an essential element of the crime."

*Id.* (quoting *United States v. Spinner*, 152 F.3d 950, 956 (D.C. Cir. 1998); *see also United States v. Kilcullen*, 546 F.2d 435, 441 (1st Cir. 1976) ("[D]oubtless no court would sustain an essentially unfounded conviction…").

No one with personal knowledge testified that premium adjustment notices are usually mailed or that *this* premium notice was mailed. *See supra* Arg.I.C. Ms. Giang communicated with Travelers electronically, and Travelers told her that this form would be available online. *Id*. Given this dearth of evidence, Ms. Giang's conviction for mail fraud was a clear and gross injustice and must be vacated. The case must be remanded for resentencing. *See United States v. Brown*, 26 F.4th 48, 59 (1st Cir. 2022) (discussing "sentencing-package doctrine"); *Pepper v. United States*, 562 U.S. 476, 507 (2011); *see also United States v. Slater*, 562 F.2d 58, 62 (1st Cir. 1976).

## II.     The court improperly admitted evidence related to the requirement that withdrawals over $10,000 must be reported to the federal government.

Before trial, the government said it planned to introduce evidence "'that the defendant structured cash withdrawals to avoid filing of Currency Transaction Reports.'"[5] JA.I 66. Ms. Giang filed a motion in

---

[5] Banks must file a CTR with the U.S. Department of the Treasury when an individual makes a cash transaction over $10,000. 31 C.F.R. 1010.311.

limine objecting to the introduction of such evidence under Federal Rules of Evidence 104(b), 403, and 404(b). JA.I 66-90. The government responded that this evidence contextualized Ms. Giang's statement that she used the cash to pay workers, was intrinsic to the charged crimes because it suggested that Ms. Giang was trying to avoid reporting requirements, and was relevant to knowledge and intent under Rule 404(b). JA.I 91-118. It said that it would "*not* present evidence or argue that the defendant violated any law prohibiting the structuring of transactions to avoid bank reporting requirements" but would argue that she "purposefully withdrew cash in amounts that would not trigger her bank's reporting requirements." JA.I 92. The court denied Ms. Giang's motion based on "the government's agreement that it will not present evidence of or argue restructuring as a discrete violation of law…." Add. 2. Ms. Giang objected when the government offered evidence related to the reporting threshold. *See, e.g.*, JA.I 141-45, 249-57; JA.II 452-53, 538.

### A. Standard of review.

Evidence of an accused's prior bad acts cannot be introduced to show propensity, but may be introduced if it has special relevance, "such as proving motive, opportunity, intent, preparation, plan, knowledge,

identity, absence of mistake, or lack of accident." Fed.R.Evid. 404(b); *see also United States v. Hicks*, 575 F.3d 130, 141-42 (1st Cir. 2009). Evidence is inadmissible under Rule 404(b) if it "include[s] 'bad character or propensity as a necessary link in the inferential chain.'" *United States v. Varoudakis*, 233 F.3d 113, 118 (1st Cir. 2000) (quoting *United States v. Frankhauser*, 80 F.3d 641, 648 (1st Cir. 1996)). "Prior bad act evidence that surmounts the bar of Rule 404(b) may still be inadmissible under Rule 403. This rule requires the trial court to exclude the evidence if its probative value is substantially outweighed by 'the danger of unfair prejudice.'" *Id.* at 121 (quoting Fed. R. Evid. 403).

This Court reviews "the district court's determination that evidence was admissible under Rule 404(b) and 403 for an abuse of discretion." *Id.* at 118. Ms. Giang preserved the argument that evidence related to reporting requirements and her alleged efforts to avoid them was inadmissible. She filed a pretrial motion objecting to its admission and objected when the issue arose at trial.[6] JA.I 66-90, 141-45, 249-57; JA.II 452-53, 538.

---

[6] The court prevented the government from asking Ms. Giang whether her bank closed her account "because of what [she was] doing with [her] withdrawals to avoid the reporting requirements." JA.II 538. It otherwise allowed the objected-to evidence.

**B.** **The evidence did not support the inference that Ms. Giang tried to avoid triggering reporting requirements and was irrelevant.**

The government introduced evidence showing the times, dates, and amounts of cash Ms. Giang withdrew. JA.II 451-56, 472-73, 834-51. Ms. Giang did not object to the introduction of this information. She objected to the introduction of evidence that banks are required to report withdrawals of more than $10,000 and that she tried to avoid triggering such reports. JA.I 66-90, 141-45, 249-57; JA.II 452-53, 538. A teller at Ms. Giang's bank testified that she told Ms. Giang about these reporting requirements.[7] JA.I 253. The government argued that Ms. Giang withdrew money in a way intended to avoid these reporting requirements. JA.II 556-57, 564.

The government's argument that this evidence was relevant requires the inference that Ms. Giang intentionally limited her withdrawals to avoid triggering reporting requirements. *See, e.g.*, JA.I 91-94; JA.II 556-57, 564. The evidence did not support this inference. Ms. Giang routinely withdrew thousands of dollars before reportedly being told about the reporting requirements, and she continued to do so after. JA.II 451-56, 472-73, 834-51.

---

[7] Ms. Giang said she did not remember being told about the reporting requirements and did not know about them. JA.II 517-18, 534-38.

After possibly being informed about the reporting requirements, Ms. Giang repeatedly withdrew more than $10,000 at once. *Id*. Assuming, arguendo, that she knew about and understood the reporting requirements, she willingly triggered them. The evidence did not permit the inference that Ms. Giang tried to avoid the reporting requirements. Without this inference, evidence of those requirements is irrelevant, and the court abused its discretion by admitting it.

C.   **Even accepting, arguendo, that Ms. Giang tried to avoid triggering reporting requirements, this evidence did not have special relevance and was unfairly prejudicial.**

Even accepting, arguendo, that Ms. Giang intentionally avoided reporting requirements, this evidence has no special relevance.[8] The government alleged that Ms. Giang committed the charged conduct continuously between 2015 and 2019. JA.I 12-15. During this time, Ms. Giang routinely withdrew thousands of dollars. JA.II 451-56, 472-73, 834-51. During this period she repeatedly withdrew more than $10,000,

---

[8] The government suggested that this evidence was admissible because it would not present the alleged "structuring" as a crime. JA.I 91-94. However, it presented Ms. Giang's withdrawals as nefarious and calculated to avoid reporting requirements. JA.II 556, 564. This allegedly bad act must be assessed under Rule 404(b) just as a crime would be. *See* Fed.R.Evid. 404(b).

triggering the reporting requirement. *Id.* Even assuming, arguendo, that at some point she intentionally tried to avoid reporting requirements, the fact that her behavior changed during the charged offenses indicates that any such effort was not related to the charged offenses. Without a connection to the charged offenses, evidence related to the reporting requirements has no special relevance.

Even assuming, arguendo, that this evidence had special relevance, it was unfairly prejudicial, confused the issues, and misled the jury. Evidence related to the reporting requirements suggested that Ms. Giang was engaged in multiple types of misconduct. Given its minimal probative value, evidence about bank-reporting requirements was unnecessary and unfairly prejudicial. *See Varoudakis*, 233 F.3d at 122 ("The prejudice to an opponent can be said to be 'unfair' when the proponent of the evidence could prove the fact by other, non-prejudicial evidence…. Doubts about the probative value of prior bad acts evidence are thus 'compounded' when prosecutors have other evidence available."). This evidence was distracting; its admission raised the irrelevant question of whether Ms. Giang sometimes tried to avoid triggering the reporting requirements. The jury had no instructions or explanation of structuring to guide it. *Cf.* 31

U.S.C. §5324; Pattern Criminal Jury Instructions for the District Courts of the First Circuit §4.31.5322 (February 6, 2024).

The court abused its discretion by admitting evidence of reporting requirements and Ms. Giang's supposed efforts to avoid them. This evidence was unfairly prejudicial and had marginal, if any relevance. It should have been excluded under Rules 404(b) and 403. The government used this evidence to support convictions on all 5 counts. JA.I 91-94; JA.II 556-57, 564. Its improper admission requires reversal of all counts.

III.  **The court wrongly failed to give implicit-bias instructions after empanelment and before deliberations.**

Ms. Giang requested implicit-bias instructions after empanelment and before deliberations. JA.I 45-50. These instructions, recommended by the Massachusetts Supreme Judicial Court in all trials, explain that implicit bias exists because people have "built-in expectations and assumptions" that can operate without their knowledge. *Id.*; *see also* Supreme Judicial Court Model Jury Instructions on Implicit Bias, *available at* https://www.mass.gov/info-details/supreme-judicial-court-model-jury-instructions-on-implicit-bias. They suggest that jurors can combat the impact of implicit bias by taking their time, keeping an open mind,

listening to all the witnesses, thinking about people as individuals, and considering whether they would view the evidence differently depending on the race, ethnicity, or gender of the people involved. JA.I 45-50. They urge jurors to "do your best to resolve this case based upon the evidence and law, without sympathy, bias, or prejudice, to the best of your ability as human beings." *Id.*

The court declined to give these instructions, stating:

> And no, the implicit bias, I know it well. I don't like it, because I think it raises bias that otherwise wouldn't exist. And then particularly where the defendant is Vietnamese, and I don't think there's any generalized bias against Vietnamese. I think most Vietnamese are Americans and are a pretty admired community by most people. I don't see that as an issue. But I also don't, I think the instruction is poor — is a poor one. I know the SJC is very proud of it, but I'm not inclined to give it.

JA.I 140-41; *see also* JA.I 373. Before giving its instructions, the court added:

> Implicit bias I'm not going to give, and I'll elaborate further on this, but first of all, talking about bias against Asians makes no sense because "Asian" has so many meanings. An Asian could be a Philippine; it could be a Korean; it could be Chinese; it could be, in some people's mind, South India, Pakistani. There's no such thing as an Asian construct in my mind. It's like trying to talk about Hispanics in a raw sense. But if there is such a thing as an Asian stereotype, if anything, I think the bias is a positive one. The stereotype that I'm familiar with is that Asians are hardworking, highly-educated, dependable, law-abiding. So I don't think there is any cause or reason or rationale for giving that as an instruction.

JA.II 382-83; *see also* JA.II 608-09.

## A.     Standard of review.

"A district court's refusal to give a requested instruction is reviewed de novo." *United States v. Figueroa-Lugo*, 793 F.3d 179, 191 (1st Cir. 2015). "The initial threshold determination we must make is whether the evidence, viewed in the light most favorable to the defense, 'can plausibly support the theory of the defense.'" *Id.* (quoting *United States v. Gamache*, 156 F.3d 1, 9 (1st Cir. 1998)). "If the evidence is sufficient, we then move onto a three-part test where the district court is reversed only if the proffered instruction was '(1) substantively correct as a matter of law, (2) not substantially covered by the charge as rendered, and (3) integral to an important point in the case so that the omission of the instruction seriously impaired the defendant's ability to present his defense.'" *United States v. McLellan*, 959 F.3d 442, 467 (1st Cir. 2020) (quoting *United States v. Baird*, 712 F.3d 623, 628 (1st Cir. 2013)).

This Court reviews voir-dire procedures for abuse of discretion. *United States v. Parker*, 872 F.3d 1, 6 (1st Cir. 2017); *United States v. Casanova*, 886 F.3d 55, 60 (1st Cir. 2018). "The dispositive question [is]…whether our review of the record leaves us with a definite and firm conviction that the

33

court below committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors." *United States v. Gelin*, 712 F.3d 612, 621 (1st Cir. 2013) (internal quotations omitted).

Ms. Giang preserved her objection to the court's failure to give implicit bias instructions after empanelment and before deliberations. She requested these instructions before trial. JA.I 45-50. She objected when the court did not give the proposed instructions after empanelment and before deliberations. JA.I 190; JA.II 608-09.

## B.    The importance of educating jurors about implicit bias.

Research shows that bias is not always overt. Nearly all humans have implicit biases—subconscious stereotypes and attitudes that shape their reactions without their awareness. *See, e.g.,* Jerry Kang & Kristen Lane, *Seeing Through Colorblindness: Implicit Bias and the Law*, 58 UCLA L. Rev. 465, 473 (2010) ("Implicit biases…are both pervasive (most individuals show evidence of some biases), and large in magnitude, statistically speaking."); Judge Mark W. Bennett, *Unraveling the Gordian Knot of Implicit Bias in Jury Selection*, 4. Harv. L. & Pol. Rev. 149, 149 (2010); Anthony G. Greenwald & Linda Hamilton Krieger, *Implicit Bias: Scientific Foundations*, 94 Cal. L. Rev. 945, 951 (2006); Gary Blasi, *Advocacy Against the Stereotype*, 49

UCLA L. Rev. 1241, 1243 (2002) ("The behavior of real human beings is often guided by racial and other stereotypes of which they are completely unaware."); The Honorable Cherron Payne, *All Cases Matter: Mitigating Bias in the Administrative Law Judiciary*, 43 J.Nat'l Ass'n Admin.L.Jud. 1 (2023); *Lee v. Howard Hughes Medical Institute*, 607 F.Supp.3d 52, 65 (D.Mass. 2022); *see also* DE59 8-13.

Education can mitigate the impact of implicit bias. *See, e.g.*, Angela Onwauchi-Willig, *Roberts's Revision: A Narratological Reading of the Affirmative Action Cases*, 137 Harv.L.Rev. 192, 197 (2023) ("Implicit bias research reveals that making race salient in the assessment of people…may be a necessary precursor to reducing the effects of nonconscious racial bias."); Kang & Lane at 500 ("[B]eing aware of potential biases, being motivated to check those biases, and being accountable to a superior (as a jury feels toward a judge) should have some effect on the translation of bias to behavior."); Blasi at 1275 ("Awareness by targets of these paths to prejudice is generally a condition precedent to reducing their effects.").

One federal judge wrote:

> [E]fforts can be made to educate attorneys and potential jurors of the possible impact of implicit biases. For example, I now include a slide about implicit bias in the PowerPoint presentation that I show before

allowing attorneys to question potential jurors. As some of the "shooter bias" studies and the recent study of unconscious racial bias in trial judges have demonstrated, such information may mitigate the effect of the bias. Beyond informing various participants at the start of trial, jury instructions could include a brief discussion of implicit bias and urge jurors to attempt to control or eliminate them. Many of my colleagues are unreceptive to this idea, fearing that implicit biases will only be exacerbated if we call attention to them. However, the positive outcomes of studies attempting to teach actors about their implicit biases leave me undeterred.

Bennett at 169.

### C. The court erroneously failed to give the requested implicit-bias instructions after empanelment and before deliberations.

Ms. Giang was entitled to the requested instructions, and the court's failure to give them requires reversal. Ms. Giang argued, in part, that she did not commit the charged crimes because she did not have the required mens rea. JA.II 573-74, 581-83. She argued that as an immigrant and non-native English speaker, she did not understand the tax code or the insurance market sufficiently to commit the charged fraud. *Id*. Her identities as a Vietnamese woman, immigrant, and non-native English speaker were central at trial. There was testimony about Ms. Giang's experience as an immigrant. JA.I 330-33; JA.II 496-505. The government called 3 witnesses with a common Vietnamese last name, leading the prosecutor to note that the witnesses are not related. JA.I 294. One witness

expressed racial prejudice, saying that his wife could communicate with Ms. Giang because "[s]he speaks Asian." JA.I 216-17. Given the defense and the testimony in this case, implicit-bias instructions were justified and necessary.

The requested instructions were substantially correct. They were developed by the Supreme Judicial Court of Massachusetts, which recommends their use at all trials. *See* www.mass.gov/info-details/supreme-judicial-court-model-jury-instructions-on-implicit-bias.

The court's instructions did not otherwise address implicit bias. The court told jurors to decide the case without regard to "personal likes or dislikes, opinions, prejudice, or appeals to sympathy." JA.II 590. The court asked potential jurors whether they were "aware of any bias, prejudice, or other reason that would make it difficult for you to serve as an impartial judge of the facts of the case…". JA.I 160-61. It noted that "Ms. Giang, the defendant, is a naturalized American citizen of Vietnamese origin. She speaks English, but she is not fluent in the legal terms in the course of a criminal case, so she will require, as you can tell, the assistance of an interpreter during the trial." JA.I 166-67. It asked whether "anything about these facts" "might cause any prospective juror to doubt your ability to

treat Ms. Giang with the same fair consideration you would give to any person accused of a crime." *Id*. These statements and questions do not address implicit bias and are not a substitute for the requested instructions. *See* Bennett at 160. The proposed implicit-bias instructions were integral to the defense and the court's failure to give them seriously impaired Ms. Giang's ability to present a defense. *See* Arg.III.A.

The court wrongly asserted that implicit-bias instructions were unnecessary because there is no bias against Vietnamese or Asian people. JA.I 140-41; JA.II 382-83. There are, undoubtedly, individuals who hold negative stereotypes related to Vietnamese people, Asian people, non-English speakers, and immigrants. *See, e.g.*, Southern Poverty Law Center, *Anti-Immigrant*, *available at* www.splcenter.org/resources/extremist-files/anti-immigrant; Stop AAPI Hate, *From Pain to Power*, *available at* stopaapihate.org/wp-content/uploads/2024/09/24-SAH-NationalSurveyReport-F.pdf. The court implied that the requested instructions talked "about bias against Asians." JA.I 140-41; JA.II 382-83. The instructions do not specify any race, ethnicity, gender, or other identity that might generate implicit bias. JA.I 45-50. They do not require defining an "Asian construct" or "Asian stereotype." *See* JA.II 382-83. These

instructions are relevant regardless of the race, gender, ethnicity, or other status of a defendant, because implicit biases exist across all these lines. JA.I 45-50; *see also supra* Arg.III.B. Asking jurors to understand, be aware of, and try to set aside their implicit assumptions about others is important in all cases. It was particularly important here where Ms. Giang's identities were woven into her trial and defense.

Even if the court's failure to give the pretrial implicit-bias instructions is considered under the standard used to assess voir-dire claims, the court abused its discretion. Judges must ask voir-dire questions about racial prejudice in cases raising related concerns. *Parker*, 872 F.3d at 6-7. This voir dire need not be individual; group voir dire is sufficient. *Id.* at 8; *Casanova*, 886 F.3d at 61-62. Ms. Giang sought instructions, not questions, which would have been given to the entire venire.[9] This case raised concerns related to racial, ethnic, and immigrant prejudice. The court abused its discretion by refusing to give the requested implicit-bias instructions. Its

---

[9] Ms. Giang requested voir-dire questions about race, ethnicity, language, and immigration status. JA.I 131-32. She was satisfied with the court's voir-dire questions, which did not address implicit bias. *Id.* Counsel objected to the court's failure to give the requested implicit-bias instructions after empanelment and before deliberations. JA.I 190; JA.II 608-09.

erroneous comments about the content of the instructions and about whether people may hold biases related to these groups highlight the abuse of discretion.

Under either the de-novo or abuse-of-discretion standard, the court erred when it refused to give implicit-bias instructions after empanelment and before deliberations. Such instructions are important in all cases, as they ask jurors to examine their own preconceptions and how those preconceptions might impact their judgment. These instructions were particularly important here. Race, ethnicity, language, and immigration-status arose throughout trial. Ms. Giang's defense involved her identity as a non-English speaking, Vietnamese immigrant. The court's failure to instruct the jury about implicit bias was an abuse of discretion that seriously impaired Ms. Giang's ability to present a defense, and her convictions must be vacated.

**IV.  The court's good-faith and employment-tax instructions improperly reduced the government's burden to prove every element of the offenses charged.**

To prove a violation of 26 U.S.C. §7202, the government must establish that the defendant had a duty to "collect, account for, or pay over" taxes; knew that she had such a duty; and willfully failed to "collect,

account for, or pay over" the taxes. *See United States v. Blanchard*, 618 F.3d 562, 571 (6th Cir. 2010); JA.I 33-34, 62-63; JA.II 600-01. "Willfulness . . . requires the Government to prove that the law imposed a duty on the defendant, that the defendant knew of this duty, and that he voluntarily and intentionally violated that duty." *Cheek v. United States*, 498 U.S. 192, 201 (1991); *see also United States v. Karani*, 984 F.3d 163, 176 (1st Cir. 2021).

Proof of willfulness is necessary because the "'highly technical'" tax code could 'ensnar[e] individuals engaged in apparently innocent conduct.'" *Karani*, 984 F.3d at 176 (quoting *Bryan v. United States*, 524 U.S. 184, 194 (1998)); *see also Cheek* 498 U.S. at 205. "In the end, the issue is whether, based on all the evidence, the Government has proved that the defendant was aware of the duty at issue, which cannot be true if the jury credits a good-faith misunderstanding and belief submission, whether or not the claimed belief or misunderstanding is objectively reasonable." *Cheek*, 498 U.S. at 202; *see also Karani*, 984 F.3d at 176 ("If the jury credits a defendant's proffered ignorance or misunderstanding of the specific legal duty he is charged with violating, he cannot be held criminally liable."). A mail-fraud conviction also requires proof that the person acted willfully. *See supra* Arg.I.B; JA.II 601-05.

The court instructed that:

An employment tax is a tax imposed by federal law on the wages of individual employees, which includes an income tax, a social security tax, and a Medicare tax. Federal law requires the employer to file with the Internal Revenue Service or IRS, a Form 941, the employer's federal quarterly tax return, and to pay over to the IRS the employment taxes that the employer has collected on a quarterly basis, that is, four times a year. The employer is required to report on the IRS Form 1941 the wages that the employer paid its employees that quarter and the employment taxes paid on those wages. Wages include all compensation the employer paid the employee for work performed.

JA.II 601. When defining good faith, it explained:

Both types of crimes, failure to collect and pay over taxes and mail fraud, are alleged in the indictment to have been committed "willfully." "Willfully," as I stated earlier, means to participate voluntarily with the specific intent to do something that the law forbids. Because willfulness is an essential element of the crimes, actions taken in good faith by a defendant amount to a complete defense.

If you find that Ms. Giang believed in good faith that she was acting properly, even if she was mistaken in that belief, and even if others were injured by her conduct, it would be no crime. Good faith which negates criminal intent, however, should not be confused with good motive, which does not. *Nor can a defendant act in good faith, even though she holds a certain opinion or belief, if she also acted with the purpose of deceiving others.* Just as other material aspects of the defense, Ms. Giang has no burden to establish good faith. The burden is on the Government to prove the lack of good faith beyond a reasonable doubt.

JA.II 604-05.

Defense counsel objected to both instructions:

42

[DEFENSE COUNSEL]: Also, as previously noted, we object to lines 243 to 249 when you basically tell the jurors that payroll taxes have to be withheld—

THE COURT: I'm not telling them, the law is telling them.

[DEFENSE COUNSEL]: I know, but I think we heard some testimony that if people are subcontractors that payroll taxes don't have to be—

THE COURT: It's not a factual issue in this case.

[DEFENSE COUNSEL]: And then we also object to the language that you added at the Government's request, which is at lines 334 to 336 about you can't find good faith if there is deception, basically. I think that undercuts the specific intent requirement for tax counts as found in the *Cheek* case.

JA.II 608-09; *see also* JA.II 382-84. These instructions improperly removed elements of the offense from the jury's consideration and relieved the government of its burden of proof.

## A. Standard of review.

"Preserved claims of instructional error are reviewed under a two-tiered standard: we consider de novo whether an instruction embodied an error of law, but we review for abuse of discretion whether the instructions adequately explained the law or whether they tended to confuse or mislead the jury on the controlling issues." *United States v. Jadlowe*, 628 F.3d 1, 14 (1st Cir. 2010) (internal quotations omitted); *see also United States v. Cantwell*, 64 F.4th 396, 409 (1st Cir. 2023). "In a federal criminal trial, the Fifth Amendment's guarantee of due process of law requires the

government to prove beyond a reasonable doubt every element of the offense for which the defendant is charged. Thus, jury instructions may violate a defendant's constitutional right to due process if they relieve the government of its obligation to meet that requirement." *United States v. Latorre-Cacho*, 874 F.3d 299 (1st Cir. 2017).

Ms. Giang preserved her objection to the good-faith and employment-tax instructions quoted above. *See* JA.II 382-84, 608-09.

## B. The employment-tax instruction contained an incomplete statement of tax law that relieved the government of its burden to prove every element beyond a reasonable doubt.

The court's instruction did not misstate tax law. However, it did not adequately explain the law, tended to confuse and mislead the jury, and relieved the government of its burden to prove every element beyond a reasonable doubt. It relieved the government of its burden to prove that Ms. Giang had a duty to collect/account for/pay over taxes, knew about that duty, and willfully ignored it. Employers have different duties with respect to payments made to employees and subcontractors. Employers must withhold employment taxes from wages paid to employees and report those wages on Form 941. JA.II 411-12. Employers are supposed to

give subcontractors a Form 1099, but do not need to withhold taxes from their wages or report them on Form 941. JA.II 429-30, 435-36.

There were factual issues as to whether some individuals Ms. Giang paid were subcontractors and whether she understood them to be such. Mr. Curreri testified that Ms. Giang's insurance application represented that she did not employ subcontractors. JA.I 367-68. When he audited Ms. Giang's policy in 2020, he asked her about the subcontracted services reported on her 2018 taxes. JA.II 387-93; *see also* JA.II 407-10. She responded that this money was paid to people who worked "day of during the busy season" when she did not have enough employees. JA.II 388. Mr. Curreri was not "able to confirm whether" these cash payments went "to day-of busy-season labor." JA.II 389.

Agent Comtois explained that Ms. Giang's tax return showed money paid to subcontractors "separate from wages that would be paid to an employee." JA.II 429-30. He said that Able did not file any Form 1099s. *Id.* He discussed the multiple "rules" and "categories of factors" involved in deciding whether someone is an employee or a subcontractor. JA.II 435-36. He explained that "an individual can be paid wages and subcontractor

payments by the same employer" but cannot receive both "for the same work." JA.II 437-38.

Mr. Hussey reviewed Ms. Giang's bank statements when preparing her taxes. JA.II 480-83, 492-93, 516. She told him that some withdrawals were her profit from Able and others were payments to "day laborers," or "non-consistent workers." JA.II 480-83, 516. Mr. Hussey categorized the cash payments to workers as payments to subcontractors and declared them as such on Ms. Giang's taxes. *Id.*

The government argued that Ms. Giang had a duty to withhold and pay taxes on cash wages because the individuals she paid were *employees*. JA.II 559. It used the court's instruction to argue that there was "no reasonable dispute" as to whether Ms. Giang had a duty to pay employment taxes on the cash payments. JA.II 559-61; *see also* JA.II 608-09 (court stating there was no factual issue related to subcontractors). The government argued that Ms. Giang's statements that the cash payments were made to subcontractors were false. JA.I 195-97; JA.II 558-61. It argued that the jury could infer that she acted willfully because she tried to hide how she paid workers. JA.II 561-64. The defense explained that English was not Ms. Giang's first language, she disclosed her cash payroll to her tax

preparer, did not understand the distinction between employees and subcontractors, and trusted her accountant's decision to classify her cash payroll as payments to subcontractors. JA.II 573-74, 581-83.

The court's instruction informed jurors that employers generally have an obligation to withhold taxes from the wages of "employees." JA.II 601. However, that was not the issue here. The jury had to decide whether Ms. Giang had this duty with respect to the individuals she paid in cash and whether, to the extent she had such a duty, she was aware of and willfully disregarded it. The court's instructions removed these issues from the jury's consideration. By describing an employer's duties with respect to employees without acknowledging that those duties do not exist with respect to subcontractors, the court conveyed that Ms. Giang had a duty and willfully disregarded it. This instruction relieved the government of its burden to prove every element beyond a reasonable doubt.

The court's response to counsel's objection suggests that the court thought that it was implausible for Ms. Giang to believe her cash payments could be reported as subcontractor payments rather than employee wages. JA.II 608-09. However, even if the "materiality of a statement might appear to be self-evident, or the evidence tending to establish that element might

seem overwhelming, [that] does not empower the trial court to remove consideration of that element from the jury." *United States v. DiRico*, 78 F.3d 732, 736 (1st Cir. 1996); *see also Cheek*, 498 U.S. at 202 (if jury "credits a good-faith misunderstanding and belief submission," government has not met its burden "whether or not the claimed belief or misunderstanding is objectively reasonable.").

The court's employment-tax instructions were an abuse of discretion requiring reversal of all counts. All five counts rely on the same premise: Ms. Giang tried to conceal "wages" paid to employees. If the cash payments had been made to subcontractors, she would not have had a duty to pay employment taxes on them and they would not have impacted her payroll. Travelers relied on Form 941 to set its premiums. JA.I 355-56. The counts were inextricably linked. If Ms. Giang did not fail to pay over taxes to the IRS, she did not intentionally defraud her insurance company as charged. This erroneous instruction requires reversal of all counts.

**C. The court's good-faith instruction erroneously reduced the government's burden of proof and tended to confuse and mislead the jury on a critical issue.**

Ms. Giang objected to the court's instruction that a defendant cannot "act in good faith, even though she holds a certain opinion or belief, if she

also acted with the purpose of deceiving others." JA.II 604-05, 608-09. The court erroneously characterized this instruction as "a correct statement of First Circuit law." JA.II 608-09. The objected-to part of the good-faith instruction comes from a case charging access-device fraud under 18 U.S.C. §1029(a)(2). *United States v. Goodchild*, 25 F.3d 55, 59-60 (1st Cir. 1994); *see also* JA.I 37. In *Goodchild*, while reviewing the defendant's sufficiency claim, this Court quoted the intent and good-faith instructions and concluded that "the jury was properly and evenhandedly instructed on intent to defraud." *Goodchild*, 25 F.3d at 59-60. The defendant in *Goodchild* requested these good-faith instructions. *Id.* This Court did not examine or discuss the part of the instruction Ms. Giang objected to. *Id.* Citing *Goodchild*, the First Circuit pattern jury instructions include this language in the access-device-fraud instructions. Pattern Criminal Jury Instructions for the District Courts of the First Circuit §4.18.1029. The pattern instructions do not suggest this language in connection with mail fraud or tax-related charges.[10] *Id.* at §§4.18.1341, 4.26.7201.

---

[10] There is no First Circuit pattern instruction for 26 U.S.C. §7202.

The court's instruction was incorrect and tended to confuse or mislead the jury, and the court abused its discretion by giving it. *See* Arg.III.A. Willfulness is an important element in tax cases because it prevents criminal convictions for taxpayer mistakes. *See Karani*, 984 F.3d at 176; *Cheek*, 498 U.S. at 205. Willfulness was central in this case, where Ms. Giang argued that she did not understand her obligations and did not willfully fail to withhold and pay over taxes. JA.II 573-74, 581-83. Good faith negates willfulness. When considering this element, the jury's focus should have been on Ms. Giang's state of mind with respect to her duties, not on whether she tried to deceive anyone. The court's instruction required no connection between any deceit and the alleged crime. The government argued that Ms. Giang deceived not only the IRS and Travelers, but also her daughter and a bank teller. JA.II 551. The court's instructions would allow a conviction if Ms. Giang had no knowledge of her tax duties but did not tell her daughter about her cash payments to workers because she knew her daughter did not like her carrying large sums of money. Or if she lied to the teller because she felt uncomfortable sharing personal information about her workers.

Although a good-faith instruction may not be necessary where there is a willfulness instruction, *Cheek*, 498 U.S. at 201, the instruction here confused the issues and reduced the government's burden. The jury was improperly instructed that any deceit would negate the government's burden to prove that Ms. Giang acted willfully and not in good faith. This erroneous instruction was given with respect to all 5 counts. JA.II 604-05. Whether reviewed de novo or for abuse of discretion, this error removed an element from the jury's consideration, reduced the government's burden of proof, and requires reversal of all counts.

**D.     Taken together, the instructional errors require reversal.**

Whether reviewed de novo or for abuse of discretion, each of these errors requires reversal. Looking at the instructions together strengthens this conclusion. Both erroneous instructions relieved, inter alia, the government's burden to prove that Ms. Giang acted willfully. *See supra* Arg.IV.B&C. The instructions misstated the law, had the potential to confuse or mislead the jury, and/or failed to convey accurate law integral to the theory of defense. The erroneous instructions require reversal of all counts under either standard of review.

## CONCLUSION

For the foregoing reasons, Ms. Giang asks this Court to vacate her conviction and order the court to dismiss Count 5 and remand for resentencing and/or to vacate her convictions on all counts and remand for a new trial.

Respectfully Submitted,

*/s/ Christine DeMaso*

Christine DeMaso
Assistant Federal Public Defender
51 Sleeper St.—5th Floor
Boston, MA 02210
(617) 223-8061
Identification No. 1168061

Dated: March 28, 2025

## CERTIFICATE OF COMPLIANCE WITH RULE 32(A)

Certificate of Compliance With Type-Volume Limitation, Typeface
Requirements, and Type Style Requirements

1.      This brief complies with the type-volume limitation of Fed. R. App. P.
        32(a)(7)(B) because:

              this brief contains 10,978 words, excluding the parts of the brief
              exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P.
        32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6)
        because:

              this brief has been prepared in a proportionally spaced typeface
              using Microsoft Word and 14-point Book Antiqua font.

                              */s/ Christine DeMaso*
                              Christine DeMaso

                              Attorney for Lilian Giang

                              Dated: March 28, 2025

## CERTIFICATE OF SERVICE

I, Christine DeMaso, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants, including all counsel of record, specifically, Donald Campbell Lockhart, as identified on the Notice of Electronic Filing on March 28, 2025.

*/s/ Christine DeMaso*
Christine DeMaso

# ADDENDUM

**TABLE OF CONTENTS**

Docket Entry 64 (4/1/24)...............................................................................Add. 1

Excerpt from Status Conference Transcript (4/4/24) ............................Add. 3

Excerpt from Trial Day 1 Transcript (4/8/24)........................................Add. 6

Excerpt 1 from Trial Day 3 Transcript (4/10/24)....................................Add. 8

Excerpt 2 from Trial Day 3 Transcript (4/10/24)...................................Add. 11

Excerpt 3 from Trial Day 3 Transcript (4/10/24)...................................Add. 13

Excerpt 4 from Trial Day 3 Transcript (4/10/24)...................................Add. 16

Judgment .....................................................................................................Add. 19

# United States District Court
## District of Massachusetts (Boston)
## CRIMINAL DOCKET FOR CASE #: 1:23–cr–10062–RGS–1

Case title: USA v. Giang

Date Filed: 03/08/2023

Date Terminated: 09/09/2024

---

Assigned to: Judge Richard G. Stearns

Appeals court case number:
24–1829 USCA – First Circuit

### Defendant (1)

**Lilian Giang**
*TERMINATED: 09/09/2024*

represented by **Jane F. Peachy**
Federal Public Defender Office
District of Massachusetts
51 Sleeper Street
5th Floor
Boston, MA 02210
617–223–8061
Email: jane_peachy@fd.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Public Defender or Community Defender Appointment*

**Aziza Hawthorne**
Federal Public Defender Office
51 Sleeper Street
5th Floor
Boston, MA 02210
617–223–8061
Email: aziza_hawthorne@fd.org
*ATTORNEY TO BE NOTICED*
*Designation: Public Defender or Community Defender Appointment*

**Forrest W. Kim**
Forrest Kim & Company, PC
128 Dorrance Street Unit 630
Providence, RI 02903
401–229–3412
Email: forrest@forrestkim.com
*TERMINATED: 01/11/2024*
*Designation: Retained*

### Pending Counts

26 U.S.C. § 7202– FAILURE TO COLLECT OR PAY OVER TAXES
(1–4)

18 U.S.C. § 1341– MAIL FRAUD
(5)

### Disposition

18 months in the custody of the Bureau of Prisons; 2 years supervised release; $500 special assessment; $845,382.00 restitution

18 months in the custody of the Bureau of Prisons; 2 years supervised release; $500 special assessment; $845,382.00 restitution

### Highest Offense Level (Opening)

## Add. 1

Felony

**Terminated Counts**                                    **Disposition**
None

**Highest Offense Level
(Terminated)**
None

**Complaints**                                           **Disposition**
None

**Plaintiff**
USA                            represented by  **Christopher J. Markham**
                                               DOJ–USAO
                                               One Courthouse Way
                                               Boston, MA 02210
                                               617–748–3236
                                               Email: christopher.markham2@usdoj.gov
                                               *LEAD ATTORNEY*
                                               *ATTORNEY TO BE NOTICED*
                                               *Designation: Assistant US Attorney*

                                               **Kristen A. Kearney**
                                               United States Attorney's Office MA
                                               1 Courthouse Way
                                               Suite 9200
                                               Boston, MA 02210
                                               617–748–3204
                                               Email: kristen.kearney@usdoj.gov
                                               *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 04/01/2024 | 64 | Judge Richard G. Stearns: ELECTRONIC ORDER entered denying 61 MOTION in Limine to Exclude Allegations of Structuring as to Lilian Giang, DENIED, given the government's agreement that it will not present evidence of or argue restructuring as a discrete violation of law, the court sees no basis to limit evidence of defendant's actions with respect to her bank account withdrawals. (Maynard, Timothy) (Entered: 04/01/2024) |

**UNITED STATES DISTRICT**
**DISTRICT OF MASSACHUSETTS**


| | |
|---|---|
| **UNITED STATES OF AMERICA,** | ) |
| **Plaintiff,** | ) |
| **vs** | )   No. 1:23-CR-10062 |
| **LILIAN GIANG,** | ) |
| **Defendant.** | ) |


BEFORE THE HONORABLE RICHARD G. STEARNS
UNITED STATES DISTRICT JUDGE
STATUS CONFERENCE


John Joseph Moakley United States Courthouse
Courtroom No. 21
One Courthouse Way
Boston, Massachusetts  02210

THURSDAY, APRIL 4, 2024
11:30 A.M.


Catherine L. Zelinski, RPR, CRC
Official Court Reporter
John Joseph Moakley United States Courthouse
One Courthouse Way, Room 3-205
Boston, Massachusetts  02210
Email: CAL.Zelinski.Steno@gmail.com


Mechanical Steno - Computer-Aided Transcript


**Add. 3**

1  we intend on listening to one of the IRS witness's testimony

2  because she's doing a summary of the financial records.  We're

3  happy to brief this issue.

4      THE COURT:  No, that seems reasonable to me as far as

5  experts.

6      MR. MARKHAM:  Yes, your Honor.

7      THE COURT:  But the others will be sequestered.

8      MS. PEACHY:  With regard to jury instructions, your

9  Honor, I did request two preliminary instructions, not on the

10  substantive law, but one relates to the jurors not going on the

11  internet and using social media.

12      THE COURT:  You have to do that, I do that by

13  instinct.

14      MS. PEACHY:  Okay, great.  Great.  The other one was

15  an implicit bias instruction that actually comes from the

16  Massachusetts Supreme Judicial Court.  There's a preliminary

17  version of the instruction and a final version of the

18  instruction, just to put it on the jurors' radars that it's

19  something they should be aware of and kind of check themselves

20  on as they're listening to the evidence at trial.

21      THE COURT:  Okay, as to the first one, we'll have

22  covered that.  And no, the implicit bias, I know it well.  I

23  don't like it, because I think it raises bias that otherwise

24  wouldn't exist.  And then particularly where the defendant is

25  Vietnamese, and I don't think there's any generalized bias

**Add. 4**

1    against Vietnamese.  I think most Vietnamese are Americans and
2    are a pretty admired community by most people.  I don't see
3    that as an issue.  But I also don't, I think the instruction is
4    poor -- is a poor one.  I know the SJC is very proud of it, but
5    I'm not inclined to give it.
6             MS. PEACHY:  Okay.
7             I might object at the start of the case, then.
8             THE COURT:  Okay.
9             MS. PEACHY:  Because I do, I do think it's appropriate
10   here.
11            As the government pointed out, there are some
12   lingering objections to two e-mail exhibits.  One of them we
13   object to in whole, it's government's Exhibit 95.  They are
14   e-mails back and forth between employees of the Rockland Trust
15   Bank.  And this was part of my earlier filed motion in Limine
16   basically talking about why is she taking out so much cash.  We
17   need to talk to her.  What is she using the cash for?  We
18   suspect they don't use the word structuring, but we -- they
19   exceed the CTR reporting threshold.  So it's kind of rife with,
20   in my mind, suspicion of wrongdoing on the part of the bank.  I
21   know there are bank employees who are coming to testify about
22   conversations that they had with Ms. Giang in the context of
23   these e-mails and the government says the e-mails are necessary
24   to provide that context, but I don't believe that everything --
25   at least not everything in these e-mails, which like I said,

**Add. 5**

```
 1                    UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF MASSACHUSETTS
 2


 3
                                        )
 4      UNITED STATES OF AMERICA,       )
                                        )
 5              Plaintiff,              )
                                        )  Criminal Action
 6      v.                              )  No. 1:23-cr-10062
                                        )  Pages 1 to 93
 7      LILIAN GIANG,                   )
                                        )
 8              Defendant.              )
                                        )
 9


10


11          BEFORE THE HONORABLE RICHARD G. STEARNS
                  UNITED STATES DISTRICT JUDGE
12


13                         JURY TRIAL
                             Day 1
14


15
                         April 8, 2024
16                        10:00 a.m.


17

            John J. Moakley United States Courthouse
18                    Courtroom No. 21
                     One Courthouse Way
19               Boston, Massachusetts 02210


20


21


22
                 Jessica M. Leonard, CSR, FCRR
23                  Official Court Reporter
            John J. Moakley United States Courthouse
24                    One Courthouse Way
                 Boston, Massachusetts 02210
25               JessicaMichaelLeonard@gmail.com
```

1  wondering:  What is this supposed to accomplish?  And then

2  sometimes it occurs to me.  But I leave it to you to see what

3  you think of them as you pass them everyday coming and going.

4         The way we will conduct the trial, we're going to

5  begin with what are called opening statements by counsel.

6  These are not arguments.  This is simply a quick introduction

7  to the facts of the case as the lawyers see the benefit of

8  their side of the equation.  Once the opening statements are

9  done, we'll hear from our first witness.  We have lunch at

10  12:45, and then we will probably finish up around 2:30 or

11  shortly thereafter.

12         Marcia said nobody brought their glasses here.  We all

13  know we can't look at the sun, so we have to find workarounds

14  for that, but it should give you enough time to either go buy a

15  pair of glasses or come up with some alternative for not

16  ruining your eyes for the benefit of the spectacle.  With that,

17  by way of introduction, the opening statement will be by the

18  Government.

19         MS. PEACHY:  Your Honor, I do have an objection.

20  There were two preliminary instructions that I requested

21  earlier that you did not give, so I just wanted to put my

22  objection on the record.

23         THE COURT:  Noted for the record.  I think I stated

24  last week that you couldn't have them.

25                    GOVERNMENT OPENING STATEMENT

**Add. 7**

1
                      UNITED STATES DISTRICT COURT
2                  FOR THE DISTRICT OF MASSACHUSETTS

3

4                                        )
     UNITED STATES OF AMERICA,           )
5                                        )
              Plaintiff,                 )
6                                        )   Criminal Action
     v.                                  )   No. 1:23-cr-10062
7                                        )   Pages 1 to 236
     LILIAN GIANG,                       )
8                                        )
              Defendant.                 )
9                                        )

10

11
              BEFORE THE HONORABLE RICHARD G. STEARNS
12                 UNITED STATES DISTRICT JUDGE

13
                           JURY TRIAL
14                            Day 3

15
                        April 10, 2024
16                        9:00 a.m.

17

              John J. Moakley United States Courthouse
18                       Courtroom No. 21
                        One Courthouse Way
19                 Boston, Massachusetts 02210

20

21

22
                   Jessica M. Leonard, CSR, FCRR
23                     Official Court Reporter
              John J. Moakley United States Courthouse
24                      One Courthouse Way
                   Boston, Massachusetts 02210
25                 JessicaMichaelLeonard@gmail.com

**Add. 8**

1    Q.    Like the businesses?

2    A.    Oh, right, yes, who's hiring the temps, yes.

3    Q.    The businesses.  So that's what came in in 2017 from those

4    businesses, right?

5    A.    Yes.

6    Q.    And then, if you add up what Able paid in payroll,

7    additional checks and the cash withdrawals, it comes out to

8    about even?

9    A.    A million -- I would use a calculator but, yeah, it's over

10   a million.  It's a million three or something like that.

11          MS. PEACHY:  Okay, I have no other questions.  Thanks.

12          MR. MARKHAM:  Nothing further, Your Honor.

13          THE COURT:  Thank you very much.

14          THE WITNESS:  Thank you.

15          MR. MARKHAM:  Your Honor, the Government rests.

16          THE COURT:  All right, jurors, the Government has

17   concluded its evidence in the case.  I have to meet the lawyers

18   just briefly at the sidebar, so if you'll give me a minute for

19   that.

20          (A conference was held at sidebar.)

21          THE COURT:  Do you want to make the motion for the

22   record.

23          MS. PEACHY:  I want to make a motion pursuant to Rule

24   29 for a required finding, just that the Government has not met

25   its burden when the evidence is taken in the light most

**Add. 9**

1    favorable to the Government of proving each element of the

2    charged offenses.

3            THE COURT:  All right.  It's preserved.  I'll follow

4    the advice of the First Circuit and let the jury have its first

5    opportunity to rule before I make a final decision on the Rule

6    29.  So we're going to hear Mr. Hussey?

7            MS. PEACHY:  Yes, he's outside.

8            THE COURT:  And the defendant?

9            MS. PEACHY:  Yes.

10           THE COURT:  So two witnesses?

11           MS. PEACHY:  Yes.

12           THE COURT:  What time is lunch?

13           THE CLERK:  12:45.

14           THE COURT:  So we should easily get to lunch.

15           MS. PEACHY:  I believe so.

16           (The sidebar conference concluded.)

17           THE COURT:  Ms. Peachy, your first witness.

18           MS. PEACHY:  Thank you, Your Honor, the defense calls

19   Wayne Hussey.

20                        WAYNE HUSSEY,

21   having been duly sworn by the Clerk, was questioned and

22   testified as follows:

23           THE CLERK:  Please introduce yourself to the jury

24   spelling your last name.

25           THE WITNESS:  My name is Wayne Edward Hussey.  My last

**Add. 10**

1
                    UNITED STATES DISTRICT COURT
2               FOR THE DISTRICT OF MASSACHUSETTS

3

4                                      )
    UNITED STATES OF AMERICA,          )
5                                      )
             Plaintiff,                )
6                                      )  Criminal Action
    v.                                 )  No. 1:23-cr-10062
7                                      )  Pages 1 to 236
    LILIAN GIANG,                      )
8                                      )
             Defendant.                )
9                                      )

10

11
              BEFORE THE HONORABLE RICHARD G. STEARNS
12                 UNITED STATES DISTRICT JUDGE

13
                            JURY TRIAL
14                            Day 3

15
                         April 10, 2024
16                          9:00 a.m.

17

            John J. Moakley United States Courthouse
18                      Courtroom No. 21
                       One Courthouse Way
19                Boston, Massachusetts 02210

20

21

22
                  Jessica M. Leonard, CSR, FCRR
23                   Official Court Reporter
            John J. Moakley United States Courthouse
24                      One Courthouse Way
                  Boston, Massachusetts 02210
25              JessicaMichaelLeonard@gmail.com

**Add. 11**

1 voluntarily in an act with a specific intent to do something

2 that the law forbids.

3        The Government does not have to prove that a defendant

4 had sole or final authority over all three duties.  It is

5 sufficient if the Government proves beyond a reasonable doubt

6 that the defendant had significant authority over at least one

7 of the three duties.  But you must be unanimous on the duty or

8 duties over which the defendant had significant authority.

9        An employment tax is a tax imposed by federal law on

10 the wages of individual employees, which includes an income

11 tax, a social security tax, and a Medicare tax.  Federal law

12 requires the employer to file with the Internal Revenue Service

13 or IRS, a Form 941, the employer's federal quarterly tax

14 return, and to pay over to the IRS the employment taxes that

15 the employer has collected on a quarterly basis, that is, four

16 times a year.  The employer is required to report on the IRS

17 Form 1941 the wages that the employer paid its employees that

18 quarter and the employment taxes paid on those wages.  Wages

19 include all compensation the employer paid the employee for

20 work performed.

21        Ms. Giang is charged in Count 5 of the indictment with

22 violating the federal statute making mail fraud a federal

23 crime.  The relevant statute is codified as 18 United States

24 Code Section 1341.  The statute prohibits the use of the mails

25 in furtherance of any scheme or artifice to defraud, or for

**Add. 12**

```
 1                 UNITED STATES DISTRICT COURT
 2               FOR THE DISTRICT OF MASSACHUSETTS

 3

 4                                    )
     UNITED STATES OF AMERICA,        )
 5                                    )
              Plaintiff,              )
 6                                    )  Criminal Action
     v.                               )  No. 1:23-cr-10062
 7                                    )  Pages 1 to 236
     LILIAN GIANG,                    )
 8                                    )
              Defendant.              )
 9                                    )

10

11

12         BEFORE THE HONORABLE RICHARD G. STEARNS
                UNITED STATES DISTRICT JUDGE

13

14                       JURY TRIAL
                           Day 3

15

16                    April 10, 2024
                        9:00 a.m.

17

18        John J. Moakley United States Courthouse
                    Courtroom No. 21
                   One Courthouse Way
19            Boston, Massachusetts 02210

20

21

22

23            Jessica M. Leonard, CSR, FCRR
                  Official Court Reporter
         John J. Moakley United States Courthouse
24                  One Courthouse Way
              Boston, Massachusetts 02210
25            JessicaMichaelLeonard@gmail.com
```

**Add. 13**

1     defendant, and all other facts and circumstances received in

2     evidence that may aid your determination of the defendant's

3     knowledge or intent.

4           It is not necessary for the Government to prove that

5     all the details alleged in the indictment concerning the

6     precise nature and purposes of the scheme or of the material

7     transmitted by mail was false or fraudulent or that the alleged

8     scheme succeeded in defrauding anyone or that the use of the

9     mail was intended as a specific or exclusive means of

10    accomplishing the alleged fraud.

11          What must be proven beyond a reasonable doubt is that

12    the defendant knowingly devised or intended to devise a scheme

13    to defraud that was substantially the same as the one alleged

14    in the indictment, and that the use of the mails, on or about

15    the dates alleged, was closely related to the scheme because

16    the defendant either received something in the mail or caused

17    it to be mailed in an attempt to carry out the scheme.  To

18    cause the mail to be used to do an act with knowledge with the

19    use of the mail will follow in the ordinary course of business

20    or where such use can be reasonably be foreseen.

21          Both types of crimes, failure to collect and pay over

22    taxes and mail fraud, are alleged in the indictment to have

23    been committed "willfully."  "Willfully," as I stated earlier,

24    means to participate voluntarily with the specific intent to do

25    something that the law forbids.  Because willfulness is an

**Add. 14**

1  essential element of the crimes, actions taken in good faith by

2  a defendant amount to a complete defense.

3       If you find that Ms. Giang believed in good faith that

4  she was acting properly, even if she was mistaken in that

5  belief, and even if others were injured by her conduct, it

6  would be no crime.  Good faith which negates criminal intent,

7  however, should not be confused with good motive, which does

8  not.  Nor can a defendant act in good faith, even though she

9  holds a certain opinion or belief, if she also acted with the

10  purpose of deceiving others.  Just as other material aspects of

11  the defense, Ms. Giang has no burden to establish good faith.

12  The burden is on the Government to prove the lack of good faith

13  beyond a reasonable doubt.

14       Now let me say a few words about your deliberations.

15       It is your duty to discuss the case with your fellow

16  jurors for the purpose of reaching agreement if you can do so.

17  Each of you must decide the case for yourself but should do so

18  only after considering all the evidence, listening to the views

19  of your fellow jurors, and discussing the case fully with the

20  other jurors.  This case has taken a great deal of time to

21  prepare and try.  There's no reason to think that it could have

22  been better tried -- it was tried very ably by both sides -- or

23  that another jury would be better qualified to render a

24  verdict.

25       It is important, therefore, that you reach a verdict

**Add. 15**

1
                    UNITED STATES DISTRICT COURT
2               FOR THE DISTRICT OF MASSACHUSETTS

3

4                                    )
     UNITED STATES OF AMERICA,       )
5                                    )
              Plaintiff,             )
6                                    )   Criminal Action
     v.                              )   No. 1:23-cr-10062
7                                    )   Pages 1 to 236
     LILIAN GIANG,                   )
8                                    )
              Defendant.             )
9                                    )

10

11

12          BEFORE THE HONORABLE RICHARD G. STEARNS
               UNITED STATES DISTRICT JUDGE

13

14                       JURY TRIAL
                          Day 3

15

16                    April 10, 2024
                       9:00 a.m.

17

18          John J. Moakley United States Courthouse
                    Courtroom No. 21
                    One Courthouse Way
19             Boston, Massachusetts 02210

20

21

22

23          Jessica M. Leonard, CSR, FCRR
                 Official Court Reporter
24       John J. Moakley United States Courthouse
                    One Courthouse Way
               Boston, Massachusetts 02210
25           JessicaMichaelLeonard@gmail.com

**Add. 16**

1    reading of the instructions.  As soon as I do that, we will

2    select a foreperson and draw the lot which will determine the

3    alternate juror.

4          Counsel?

5          (A conference was held at sidebar.)

6          THE COURT:  I think we got everything in except I

7    forgot to take out the drawing the inference about failure to

8    testify, but I don't think that did any harm, I think it

9    reinforced the basic idea about burden of proof.

10         MS. PEACHY:  I have a few objections I'd like to put

11    on the record, Your Honor.

12         As stated earlier, we would still like the Court to

13    instruct implicit bias.  That was defendant's request number

14    two.  We also do think that the instruction on statements of

15    the defendant, which was defendant's request number seven, is

16    appropriate.  The Government made a lot out of statements that

17    Ms. Giang made to people at the bank and people -- the

18    insurance company and her accountant, and I think it's

19    appropriate to instruct the jury that they can take into

20    account the circumstances under which those statements were

21    made.

22         Also, as previously noted, we object to lines 243 to

23    249 when you basically tell the jurors that payroll taxes have

24    to be withheld --

25         THE COURT:  I'm not telling them, the law is telling

**Add. 17**

1    them.

2    MS. PEACHY:  I know, but I think we heard some

3    testimony that if people are subcontractors that payroll taxes

4    don't have to be --

5    THE COURT:  It's not a factual issue in this case.

6    MS. PEACHY:  And then we also object to the language

7    that you added at the Government's request, which is at lines

8    334 to 336 about you can't find good faith if there is

9    deception, basically.  I think that undercuts the specific

10    intent requirement for tax counts as found in the *Cheek* case.

11    THE COURT:  I've already explained my reasons for not

12    instructing on implicit bias, so I'm not going to repeat those.

13    With respect to statements of the defendant, that is not those

14    that come directly from her but are attributed to others.  Once

15    she takes the witness stand, she's no different than any other

16    witness, and I basically have said that in evaluating

17    statements you have to look at all of the circumstances that

18    anyone made, whether her or another witness in the case.  That

19    was covered.

20    A correct statement of the law as it applies to this

21    case with respect to the filing of quarterly returns, I can't

22    see what's objectionable about that.  Congress tells me that.

23    And then finally, I think the last issue is with

24    respect to the good-faith instruction.  That was a correct

25    statement of First Circuit law and that's why I included it.

**Add. 18**

AO 245B (Rev. 09/19)  Judgment in a Criminal Case
Sheet 1

# UNITED STATES DISTRICT COURT
### District of Massachusetts

| | |
|---|---|
| UNITED STATES OF AMERICA | **JUDGMENT IN A CRIMINAL CASE** |
| v. | |
| Lilian Giang | Case Number:  23CR10062-1 |
| | USM Number:  48337-510 |
| | Jane F. Peachy |
| | Defendant's Attorney |

## THE DEFENDANT:

☐ pleaded guilty to count(s) _____

☐ pleaded nolo contendere to count(s) _____
  which was accepted by the court.

☑ was found guilty on count(s)   1-5
  after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 26 U.S.C. § 7202 | Failure to Collect or Pay Over Taxes | 1/31/2018 | 1-4 |
| 18 U.S.C. § 1341 | Mail Fraud | 12/6/2018 | 5 |

The defendant is sentenced as provided in pages 2 through ___7___ of this judgment.  The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s) _____

☐ Count(s) _____ ☐ is ☐ are dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.  If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

8/21/2024
Date of Imposition of Judgment

/s/ Richard G. Stearns
Signature of Judge

Honorable Richard G. Stearns
Name and Title of Judge

9/9/2024
Date

# Add. 19

AO 245B (Rev. 09/19) Judgment in Criminal Case
Sheet 2 — Imprisonment

Judgment — Page ___2___ of ___7___

DEFENDANT:    Lilian Giang
CASE NUMBER:    23CR10062-1

## IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of:

18 months

☑ The court makes the following recommendations to the Bureau of Prisons:

The defendant be designated to a facility close to her family in Massachusetts.

☐ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

    ☐ at _____ ☐ a.m. ☐ p.m. on _____ .

    ☐ as notified by the United States Marshal.

☑ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    ☑ before 2 p.m. on __10/2/2024_____ .

    ☐ as notified by the United States Marshal.

    ☐ as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

at _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

## Add. 20

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 3 — Supervised Release

Judgment—Page   3   of   7

DEFENDANT:   Lilian Giang
CASE NUMBER:   23CR10062-1

## SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of:

  2 years

## MANDATORY CONDITIONS

1.  You must not commit another federal, state or local crime.
2.  You must not unlawfully possess a controlled substance.
3.  You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.
      ☑ The above drug testing condition is suspended, based on the court's determination that you
          pose a low risk of future substance abuse. *(check if applicable)*
4.  ☑ You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*
5.  ☑ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
6.  ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
7.  ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

## Add. 21

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
                Sheet 3A — Supervised Release

|  | Judgment—Page | 4 | of | 7 |
|---|---|---|---|---|

DEFENDANT:  Lilian Giang
CASE NUMBER:  23CR10062-1

# STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1.  You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2.  After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3.  You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4.  You must answer truthfully the questions asked by your probation officer.
5.  You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6.  You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7.  You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8.  You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9.  If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10.  You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11.  You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12.  If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.
13.  You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature  _____    Date  _____

**Add. 22**

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 3D — Supervised Release

Judgment—Page    5    of    7

DEFENDANT:  Lilian Giang
CASE NUMBER:  23CR10062-1

## SPECIAL CONDITIONS OF SUPERVISION

1. You must pay restitution in the amount of $814,800 to the IRS according to a court-ordered repayment schedule.

2. You must meet with the Internal Revenue Service within the first 14 days of the period of supervision in order to determine your prior tax liability and you are to file tax returns and pay any past or future taxes due.

3. You must pay the balance of the restitution to Traveler's Insurance Company according to a court-ordered repayment schedule.

4. You are prohibited from incurring new credit charges or opening additional lines of credit without the approval of the Probation Office while any financial obligations remain outstanding.

5. You must provide the Probation Office access to any requested financial information, which may be shared with the Asset Recovery Unit of the U.S. Attorney's Office.

Judgment — Page  6  of  7

DEFENDANT:  Lilian Giang
CASE NUMBER: 23CR10062-1

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

|  | **Assessment** | **Restitution** | **Fine** | **AVAA Assessment*** | **JVTA Assessment**** |
|---|---|---|---|---|---|
| **TOTALS** | $ 500.00 | $ 845,382.00 | $ | $ | $ |

☐ The determination of restitution is deferred until _____ .  An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☑ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below.  However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| **Name of Payee** | **Total Loss**** | **Restitution Ordered** | **Priority or Percentage** |
|---|---|---|---|
| Internal Revenue Service | | $814,800.00 | |
| Travelers Insurance Company | | $30,582.00 | |

| **TOTALS** | $ 0.00 | $ 845,382.00 |
|---|---|---|

☐ Restitution amount ordered pursuant to plea agreement  $ _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f).  All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☑ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

☑ the interest requirement is waived for the    ☐ fine    ☑ restitution.

☐ the interest requirement for the    ☐ fine    ☐ restitution is modified as follows:

\* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
\*\* Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
\*\*\* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

## Add. 24

Judgment — Page  7  of  7

DEFENDANT:  Lilian Giang
CASE NUMBER:  23CR10062-1

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

**A**  ☑  Lump sum payment of $  500.00  due immediately, balance due

    ☐  not later than _____ , or
    ☐  in accordance with ☐ C, ☐ D, ☐ E, or ☐ F below; or

**B**  ☐  Payment to begin immediately (may be combined with  ☐ C,  ☐ D, or  ☐ F below); or

**C**  ☐  Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of
_____ *(e.g., months or years)*, to commence _____ *(e.g., 30 or 60 days)* after the date of this judgment; or

**D**  ☐  Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of
_____ *(e.g., months or years)*, to commence _____ *(e.g., 30 or 60 days)* after release from imprisonment to a
term of supervision; or

**E**  ☐  Payment during the term of supervised release will commence within _____ *(e.g., 30 or 60 days)* after release from
imprisonment.  The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**F**  ☐  Special instructions regarding the payment of criminal monetary penalties:

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment.  All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐  Joint and Several

| Case Number<br>Defendant and Co-Defendant Names<br>*(including defendant number)* | Total Amount | Joint and Several<br>Amount | Corresponding Payee,<br>if appropriate |
|---|---|---|---|
| | | | |

☐  The defendant shall pay the cost of prosecution.

☐  The defendant shall pay the following court cost(s):

☐  The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.

# Add. 25